## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| NATIONAL ENERGY SECURITY OPERATIONS, LLC, | ) ) ) ) |
| Plaintiff, | ) No. 25-774 ) |
| v. | ) Filed: September 30, 2025 ) |
| | ) Re-issued: November 24, 2025* ) |
| THE UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| STRATEGIC STORAGE PARTNERS, LLC, | ) ) |
| Defendant-Intervenor. | ) ) ) |

## OPINION AND ORDER

In this post-award bid protest, Plaintiff National Energy Security Operations, LLC ("National Energy") asks the Court to permanently enjoin the Department of Energy ("DOE" or "the Agency") from proceeding with a contract awarded to Defendant-Intervenor Strategic Storage Partners, LLC ("SSP") for the management and operation of the United States' Strategic Petroleum Reserve ("SPR"). National Energy raises a variety of claims asserting that DOE erred in evaluating its proposal. National Energy's protest fails because all but one of National Energy's arguments

---

* The Court issued this opinion under seal on September 30, 2025, and directed the parties to file any proposed redactions by October 7, 2025. The opinion issued today incorporates the redactions proposed by Plaintiff. Both the Government and Defendant-Intervenor indicated that they do not object to the redactions. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 13). Redacted material is represented by bracketed ellipses "[. . .]."

are unsuccessful on the merits, and the one error that DOE did commit was not prejudicial. Accordingly, National Energy's Motion for Judgment on the Administrative Record is **DENIED**, and National Energy's Motion to Supplement the Administrative Record is also **DENIED**. The Government's Cross-Motion for Judgment on the Administrative Record and Defendant-Intervenor SSP's Cross-Motion for Judgment on the Administrative Record are **GRANTED**.

## I.    BACKGROUND

### A.    The Solicitation and Award

This bid protest concerns the procurement of a Management and Operations ("M&O") contract for the United States' SPR, which is the largest emergency supply of crude oil in the world. Admin. R. (hereinafter "AR") 40–41.[1] The SPR is stored in underground salt caverns in Louisiana and Texas. AR 41. The SPR currently has four storage sites: West Hackberry and Bayou Choctaw in Louisiana, and Bryan Mound and Big Hill in Texas. *Id.* DOE issued Solicitation No. 89243523RCR000002 ("the Solicitation") on January 4, 2024, for the procurement of this cost-plus-award-fee performance-based contract. AR 27. The contract period was anticipated to be five years, starting on September 1, 2024, with the option of extension for an additional five years. *Id.* Proposals were due by April 3, 2024. *Id.*

#### 1.    The Solicitation

The M&O contract was to be awarded on a best-value basis. AR 727. The Solicitation indicated that DOE did not intend to hold discussions but reserved the right to conduct them if

---

[1] On June 6, 2025, the Government shared the Administrative Record electronically through the Justice Enterprise File Sharing system in what was formerly the lead case in this matter, *Carondelet Energy Readiness, LLC v. United States*, No. 25-732. *See* Gov't's Notice of Filing Admin. R. at 1–2, *Carondelet Energy Readiness* ECF No. 35. The parties filed their Joint Appendix in this case following the completion of briefing. *See* ECF No. 33. Citations to the Administrative Record refer to the bates-labeled page numbers included in the Joint Appendix.

necessary.  AR 726.  It also indicated that DOE may allow clarifications under Federal Acquisition Regulation ("FAR") 15.306(a).  *Id.*

The Solicitation instructed offerors to submit proposals in three separate volumes: "Volume I – Offer and Other Documents;" "Volume II – Management Proposal;" and "Volume III – Cost or Price Proposal."  AR 684.  The Management Proposal, which is the main source of dispute in this protest, would be evaluated based on three technical factors, listed in descending order of importance: "Management Approach," "Key Personnel and Organization," and "Past Performance."  AR 732.

For Management Approach, DOE told bidders to "[f]ully describe [their] proposed approach to managing and operating activities at the Strategic Petroleum Reserve – including the proposed approach to contract transition."  AR 690–91.  For Key Personnel and Organization, DOE instructed bidders to identify key personnel for the positions of Project Manager; Director, Operations and Maintenance; Director, Engineering; Director, Environment, Safety and Health; and Director, Finance/Chief Financial Officer.  *Id.*  Finally, for Past Performance, DOE asked offerors to submit examples of relevant past performance on work of similar scope, size, and complexity.  AR 694.

As for how those factors would be evaluated, DOE set out the evaluation factors for award in Section M of the Solicitation.  AR 724–32.  Section M stated that DOE would evaluate the Management Approach, the first technical factor, by assessing:

> the depth, quality, effectiveness, and completeness of the Offeror's proposed approach to managing the contract, including implementing a contractor assurance system that identifies and corrects deficiencies; developing budgets and establishing cost controls; achieving safe and environmentally responsible performance of work; assuring the operational readiness of the storage sites/facilities; managing a large workforce; ensuring the integrity, including

3

optimal storage capacity, of the crude oil storage caverns; and identifying specific actions to reduce contract cost.

AR 728.  Relevant to this lawsuit, the Performance Work Statement ("PWS") included further details on what DOE expected offerors to provide in their Contractor Assurance System ("CAS"), which is essentially a quality assurance program.  The PWS instructed that an offeror's CAS "shall include all activities necessary to ensure that risks and environmental impacts are minimized and that safety, reliability, performance, and mission are accomplished through the application of management systems . . . ."  AR 47–48.  The PWS indicated that the CAS would have to "meet the requirements of . . . applicable DOE Order(s)" and "include a process to ensure contract requirements are being met."  AR 48.

The PWS also provided guidance on the contractor's responsibility for the SPR's ongoing Life Extension 2 ("LE2") project, which was identified as a requirement under the Management Approach.  AR 52–54.  The LE2 project is an initiative to extend the lifespan of the SPR by 25 years through repairing outdated infrastructure.  AR 52.  Divided into three sub-projects, the LE2 project includes ongoing construction at three site locations: Bryan Mound, Big Hill, and Bayou Choctaw.  *Id.*  The PWS stated that the awardee would have to satisfy 16 responsibilities related to LE2, including but not limited to "responsibility, accountability, and authority to execute the work;" "performing construction supervision, procurement/subcontract administration, project controls, safety and quality oversight;" and "providing governance and oversight of LE2."  AR 53–54.

For the second technical factor, Key Personnel and Organization, DOE stated that it would evaluate the suitability of the proposed personnel by analyzing their "demonstrated leadership; demonstrated experience in performing work similar to that described in the PWS; and

qualifications (*e.g.*, education, certifications, licenses) as presented in the resumes." AR 729. DOE also intended to evaluate key personnel through oral presentations that would "consist of a single interview question per Key Person and one Group sample problem." *Id.* Finally, the Agency would gauge the offeror's "ability to obtain, retain, and maintain adequate numbers of qualified personnel to safely, and effectively, perform all elements of the PWS." AR 730.

For both the Management Approach and Key Personnel and Organization factors, DOE used a scale of ratings—"Outstanding," "Good," "Satisfactory," "Marginal," and "Unsatisfactory"—to qualitatively describe proposals. AR 12100. These adjectival ratings reflected the Agency's assessment of offerors' understanding of the contract requirements, their proposed approach to the work, and their probability of success. *Id.* The ratings incorporated the Agency's assessment of a proposal's strengths and weaknesses in certain areas, including the CAS approach and LE2 project. AR 12101 (defining findings of "Deficiency," "Significant Weakness," "Weakness," "Strength," and "Significant Strength"). These sub-assessments factored into the Agency's ultimate assignment of an adjectival rating. For instance, to receive a rating of "Good" for its Management Approach, a proposal "would normally exhibit limited risk, significant strengths and/or strengths, and few, if any, significant weaknesses and/or weaknesses" for the Management Approach factors. AR 12100. The Agency noted that the definitions of the ratings "describe, to a certain extent, a quantitative aspect related to the number of strengths and weaknesses." *Id.*

Finally, for the third technical factor, Past Performance, DOE stated that it would assess bidders' submissions based "on the recency, relevancy, and favorability of the past performance information obtained for the Offeror performing work similar in scope, size, and complexity to the requirements of the PWS . . . ." AR 730. DOE would consider "past performance information

5

provided by the offeror" as well as "past performance information from sources other than those provided by the offeror, such as commercial and government clients, government records, . . . and close at hand information . . . ." AR 731. The Solicitation required past performance information in the specific areas of environment, safety, health, and quality. AR 696. When evaluating past performance information, the Agency said it would give greater consideration to more recent and more relevant prior work. AR 696, 730–31. Section M of the Solicitation also contemplated that, for newly formed entities and predecessor companies, past performance by an offeror's related corporate entity could be relevant past performance information for the offeror. AR 731.

The Solicitation also required offerors to provide a Past Performance Questionnaire ("PPQ") to each of their contract references. *Id.* The PPQ included 26 questions, and respondents would answer such questions on a scale that ranged from zero ("Unsatisfactory") to four ("Outstanding"). AR 714–15. The final question on the PPQ asked the reference a yes-or-no question, "Would you hire this company again?" and provided space for additional comments. AR 715. The Solicitation indicated that offerors should request that their contract references send these PPQs "directly to DOE." AR 696.

For purposes of its evaluation, the Agency indicated that it would assess each contract reference identified in an offeror's Past Performance proposal based on relevancy. AR 12110 (defining ratings for "Very Relevant," "Relevant," and "Not Relevant"). The Agency would then assign a favorability determination of either "Unfavorable," "Neither Favorable nor Unfavorable," or "Favorable" for an offeror's Past Performance on particular contract references. AR 12111. Like with the Management Approach and Key Personnel and Organization factors, the Agency's overall adjectival rating for each offeror's Past Performance proposal was determined on a five-point scale: "Outstanding," "Good," "Satisfactory," "Marginal," or "Unsatisfactory." AR 12109.

These adjectival ratings were defined separately from the ratings for the first two factors and would reflect DOE's assessment of past performance information based on recency, relevancy, and the ability of the contractor to meet the Agency's expectations with different levels of risk. *See id.* An additional finding of "Neutral" was available in the event that an offeror had no record of relevant past performance or a record that was unavailable. *Id.*

Additionally, the Agency indicated that it would evaluate Volume III, Cost or Price, for price reasonableness and cost realism in accordance with FAR 15.404. AR 728. The Cost assessment would include consideration of the offeror's transition costs, their key personnel total compensation costs for five years of the base contract plus five years of the option term, and the maximum annual earnable award fee that the offeror proposed. *Id.* As a best-value procurement, DOE indicated that a proposal's technical approach—Volume II—would be considered "significantly more important" than that proposal's evaluated price. AR 732. The Agency stated that it was "more concerned with obtaining a superior capabilities and approach proposal than making an award at the lowest evaluated price and fee." AR 727. As such, Price would likely be a determining factor in making an award only if offerors' technical proposals "are evaluated as close or similar in merit." *Id.*

####  2.     Evaluations and Award

Six bidders submitted proposals in response to the Solicitation. AR 12252–53. A Source Evaluation Board ("SEB") evaluated the proposals and prepared a report for the Source Selection Authority ("SSA"), who made the final award decision. AR 11875.

National Energy received ratings of "Good" for Management Approach, "Outstanding" for Key Personnel and Organization, and "Satisfactory" for Past Performance from the SEB.[2]  AR 11887.  The rating of "Good" for Management Approach derived from 11 strengths and two weaknesses in that category—with the weaknesses being assigned for its CAS approach and its proposal for the LE2 project.  AR 11898–99, 11901.  The assigned weaknesses were largely the result of National Energy failing to provide enough detail about its CAS approach and LE2 project proposal.

For its CAS approach, National Energy failed, in the SEB's words, to "include a comprehensive description of the [CAS] with processes, key activities, and accountabilities clearly defined."  AR 11899.  The SEB further found that National Energy's proposal "contains no mention of maintaining compliance with DOE requirements" and "does not address the identification and correction of negative performance/compliance trends before they become significant issues."  *Id.*  The SEB thus found that National Energy's CAS approach was "likely to increase the risk of poor contractor performance and can result in poor regulatory and safety compliance."  *Id.*

The SEB's findings regarding National Energy's LE2 project proposal echoed the same theme: a lack of detail led the Agency to perceive risks of unsuccessful performance.  *See* AR 11901.  The SEB found National Energy's approach to this element weak in part because National Energy indicated that it would be using the same general contractor that Fluor Federal Petroleum Operations ("FFPO"),[3] the incumbent, has been using for the LE2 project.  *Id.*  This contractor has

---

[2] National Energy's protest does not challenge the Agency's evaluation of its Key Personnel and Organization proposal.

experienced "struggles with 'complex work scopes, the requirements of DOE O 413.3B, and unforeseen ground conditions' at Bryan Mound," which resulted in a "cure notice to their subcontractor." *Id.* The SEB was unsatisfied with the approach to mitigating these issues, noting that [. . .]—*i.e.*, FFPO's method of mitigation which National Energy intended to continue—"for a GC [general contractor] operating under a firm fixed-priced contract is likely to require the removal of awarded scope by contract modification and the initiation of a new procurement, which would negatively impact LE2 cost and schedule." *Id.* The SEB also noted that although National Energy's proposal addressed unforeseen underground conditions at Bryan Mound, it did not address similar possible conditions at another site, Big Hill. *Id.* In sum, the SEB concluded that "National Energy's proposed approach to dealing with ongoing LE2 challenges is incomplete and lacks the depth and quality required to address the severity of the challenges described." *Id.*

As to Past Performance, the "Satisfactory" rating for National Energy was in part due to the SEB's finding that FFPO's performance on the incumbent prime contract was neither a strength nor a weakness. AR 11989. The SEB reported that National Energy presented six contract references in its proposal. *Id.* Of those, three contracts were "Very Relevant" and one was "Relevant." *Id.* As germane to this dispute, the Very Relevant prime incumbent contract—performed by FFPO—was characterized as "Neither Favorable nor Unfavorable," which "heavily influenced the SEB's final rating determination." *Id.* The lack of favorability for FFPO's contract was the result of "a recent downward trend in CPARS [Contractor Performance Assessment Reporting System] ratings attributed to marginal LE2 performance, poor Past Performance Questionnaires (PPQ), and some negative close at hand information substantiated by formal fee

---

[3] National Energy is 100 percent owned by Fluor Federal Services, Inc., which is the company that also owns the current incumbent contractor, FFPO. AR 12270.

determination letters." *Id.* The SEB highlighted the importance of the incumbent contract to its overall assessment of National Energy's Past Performance as "Satisfactory." *Id.*

In the award decision, the SSA largely adopted the SEB's evaluation findings for National Energy's proposal, with the exception of the Past Performance rating. Instead of assigning National Energy a rating of "Satisfactory" for Past Performance, the SSA gave National Energy a higher rating of "Good." AR 12283. The SSA noted that National Energy's incumbent entity, FFPO, "generally did well in managing the SPR during Covid and had notable accomplishments in releasing oil in response to U.S. Government requirements." *Id.* However, the SSA stated that he would not rate National Energy's Past Performance any higher than "Good" due to "the recent downward trend" in FFPO's performance. *Id.* The SSA walked through the CPARS, PPQs, and fee award determinations for FFPO in significant detail to substantiate his final conclusion that National Energy's Past Performance was "somewhat of a mixed bag." *See* AR 12282–87.

The SSA, however, found SSP's proposal to be technically superior to all other offerors, assigning it "Outstanding" for Management Approach, "Outstanding" for Key Personnel and Organization, and "Good" for Past Performance. AR 12268. Because of SSP's technical advantage, the contest narrowed to three offerors: the SSA conducted a best-value tradeoff among SSP and the two offerors that had lower prices than SSP—National Energy and Strategic Petroleum Management ("SPM"). *Id.* The other three offerors were not considered in the tradeoff because they could not represent the best value to the Government given that they were neither lower priced than nor technically superior to SSP. *Id.* Ultimately, the SSA found SSP's proposal to be superior to both National Energy's and SPM's proposals such that the price premium was warranted. AR 12301 (SSP and SPM tradeoff); *see* AR 12287–88 (SSP and National Energy tradeoff).

10

In the tradeoff decision between SSP and National Energy, the SSA explained that the Key Personnel and Organization and Past Performance factors did not play a role in his analysis because neither proposal had an advantage over the other for those two factors. *Id.* But he did directly compare National Energy's and SSP's proposals for Management Approach. AR 12271. Listing 10 PWS elements for Management Approach, the SSA compared the assignment of ratings for each element, which he summarized in a table. *Id.* For six of those elements—Operations, Major Maintenance and Engineering, Cavern Integrity, Safety and Health, CAS, and LE2—he found discriminators in SSP's favor (*i.e.*, SSP's proposal outperformed National Energy's). *Id.* The SSA additionally mentioned that "[s]ome of the discriminators in favor of SSP were substantially superior to National Energy." AR 12270. For one element—Drawdown Readiness—he found a discriminator in National Energy's favor. AR 12271. And for the remaining three elements, he concluded neither SSP nor National Energy had an advantage. *Id.*

| | National Energy | SSP | Discriminator |
|---|---|---|---|
| Contract Transition | Strength | Significant Strength | No |
| Operations | | Strength | Yes - for SSP |
| Drawdown Readiness | Significant Strength | | Yes - for National Energy |
| Major Maintenance and Engineering | Strength | Significant Strength | Yes - for SSP |
| Cavern Integrity | Strength | Significant Strength | Yes - for SSP |
| Environmental | Strength | | No |
| Safety and Health | | Significant Strength | Yes - for SSP |
| Contractor Assurance System | Weakness | Significant Strength | Yes - for SSP |
| Procurement/ Contracts | Strength | | No |
| Life Extension 2 | Weakness | | Yes - for SSP |

*Id.*

11

The SSA delved into significant detail in describing the two discriminators that are at issue in this protest: CAS and LE2. Like the SEB, the SSA found National Energy's bullet-point CAS approach "to be lacking in specificity." AR 12274. And the SSA expressed concern that although one aspect of National Energy's CAS approach—[. . .]—could be positive in theory, there was no confirmation that such a [. . .] would actually exist. *Id.* SSP's CAS approach, contrastingly, was much stronger and more detailed. *Id.* In all, the SSA found SSP's proposal to have the upper hand in the CAS approach element, assigning SSP a "Significant Strength" in this area while giving National Energy a "Weakness." AR 12275.

In discussing the LE2 element tradeoff, the SSA largely repeated the SEB's concerns about National Energy's LE2 approach. *See* AR 12275–76. Although acknowledging several "positive aspects" of its proposal, the SSA stated that National Energy's "listing of FFPO mitigating actions lacks detail and does not provide the specifics necessary to substantiate an improved approach to LE2 with the use of the same GC." *Id.* In contrast, SSP's approach proposed a "[. . .]" and recognized that the LE2 program addressed three SPR storage sites. AR 12276. This superior approach, though not detailed enough to warrant a "Strength," led the SSA to the conclusion that SSP deserved a discriminator in this element as it was clearly superior to National Energy's corresponding "Weakness." *Id.*

On Cost or Price, National Energy proposed a total cost of $[. . .], while SSP submitted a proposed cost of $128,982,726. AR 11992. These sums were made up of each offeror's proposed fee, transition cost, and key personnel total compensation cost. *Id.* All six of the offerors, including SSP and National Energy, proposed fees that were below the Government's maximum available fee ceiling. *Id.* Although SSP's proposal was $[. . .], or [. . .] percent, more expensive than National Energy's, the SSA found that "SSP offered a far better management approach . . .

12

[which] amply warrants the relatively small price premium." AR 12287–88. The SSA cited SSP's superior Management Approach, including its approaches to major maintenance and engineering, vapor pressure mitigation, and safety and health. AR 12288.

In conclusion, although the SSA described National Energy's proposal as "certainly robust," he summarized its main drawbacks as being its poor CAS approach and its inadequate approach to LE2, "specifically in [National Energy's] failure to demonstrate specifics necessary to substantiate an improved approach in managing the same general contractor at Big Hill for work that previously had issues at the Bryan Mound site." *Id.* Because SSP had "the most advantageous technical approach," which was worth the [. . .]-percent price premium over National Energy, the SSA determined that SSP's proposal represented the best value to the Government. *See* AR 12301–02. As such, DOE awarded the M&O contract to SSP. *Id.*

### B.    Procedural History

On May 5, 2025, National Energy filed its Complaint. *See* ECF No. 1.[4] The Court subsequently consolidated National Energy's protest with a protest filed by another offeror, Carondelet Energy Readiness, LLC ("Carondelet"). *See* Order, ECF No. 11. After Carondelet voluntarily dismissed its suit on June 27, 2025, the Court de-consolidated the cases. *See Carondelet* ECF No. 35.

Consistent with the Court's scheduling order, on July 17, 2025, National Energy filed an Amended Complaint, a Motion for Judgment on the Administrative Record, and a Motion to Supplement the Administrative Record. *See* ECF Nos. 15, 16, 17. The Government and SSP cross-moved and responded on July 22, 2025. *See* Def.-Intervenor's Cross-Mot. for J. on Admin.

_____

[4] Unless otherwise noted, citations in this opinion to filings on the docket refer to the *National Energy* docket.

R., ECF No. 20; Gov't Cross-Mot. for J. on Admin. R., ECF No. 21.  While SSP did not oppose National Energy's Motion to Supplement, the Government did, filing a response to that motion on July 22, 2025.  *See* Gov't Resp. to Mot. to Suppl., ECF No. 22.  All motions are now fully briefed. *See* Pl.'s Resp. & Reply to Cross-Mots., ECF No. 23; Pl.'s Reply in Supp. of Mot. to Suppl., ECF No. 24.; Def.-Intervenor's Reply, ECF No. 31; Gov't's Reply, ECF No. 32.  The Court held oral argument on September 4, 2025.  *See* Min. Entry (Sept. 4, 2025).

## II.   LEGAL STANDARDS

### A.   Motion for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC") governs motions for judgment on the administrative record.  Deciding such motions compares to an "expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine dispute of material fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357; *Martinez*, 77 Fed. Cl. at 324.

### B.   Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, confers on this Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The Tucker Act requires that

this Court review agency actions "pursuant to the standards set forth" in the Administrative Procedure Act ("APA"). *Id.* § 1491(b)(4); *see Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under the APA, this Court asks whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).

To succeed in a bid protest, a plaintiff "must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). Under the APA standard of review, a procuring agency's action "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.

Government contracting officers receive significant deference in carrying out their procurement duties. *Id.* at 1332–33. When a contracting officer makes a reasonable decision within the scope of the broad discretion such officers have, this Court "may not substitute its judgment for that of the agency." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)). As a result, bid protestors have a "heavy burden" to overcome the presumption of regularity that the Court affords to agency decisions. *Impresa*, 238 F.3d at 1338. Such decisions should stand if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id.* at 1333. "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

15

C.    **Motion to Supplement Standard**

In bid protests, as in cases brought under the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp*, 411 U.S. at 142). Thus, an administrative record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." *Id.* at 1381. Courts have found supplementation appropriate under this standard where the supplemental material is "necessary to help explain an agency's decision . . . , particularly when a subjective value judgment has been made but not explained," *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004) (citing *Camp*, 411 U.S. at 142–43); helps explain what the contracting officer reviewed and considered in reaching his or her decision, *Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 747 (2006), *aff'd*, 228 F. App'x 980 (Fed. Cir. 2007); or "correct[s] mistakes and fill[s] gaps" in the administrative record, *Pinnacle Sols., Inc. v. United States*, 137 Fed. Cl. 118, 131 (2018) (citing *Axiom*, 564 F.3d at 1379–81).

Supplementation may also be appropriate when a protester invokes the "too close at hand" doctrine. *Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 100 n.19 (2011). "Close at hand" information refers to information "in the possession of the contracting agency or information that is personally known to the contract evaluator." *Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 398, 410 (2021). The too close at hand doctrine generally applies to past performance information that was known to an evaluator but not discussed in a proposal. *Id.* In that instance, "a court may well have to look outside of the agency record to determine tentatively what, if anything, the agency had in hand but did not consider . . . ." *Id.* (citations omitted); *see also Diversified Maint. Sys., Inc. v. United States*, 93 Fed. Cl. 794, 801 (2010).

16

## III.     DISCUSSION

National Energy asserts three main challenges to DOE's evaluation of its proposal, only one of which succeeds.  Specifically, the Court finds that National Energy has met its burden in showing DOE applied unstated evaluation criteria to assess National Energy's CAS approach because the Agency appears to have applied CAS requirements that were set forth in a post-solicitation special contract clause, not in the evaluation criteria.  National Energy, however, falls short in demonstrating that DOE also applied unstated evaluation criteria to assess National Energy's LE2 approach by critiquing the incumbent's LE2-project performance.  The Agency properly evaluated what National Energy proposed, which was a plan for LE2 that continued some of the incumbent's efforts, so it was not unreasonable for the Agency to consider the incumbent's LE2 performance issues.  Likewise unconvincing are National Energy's challenges to the Agency's evaluation of its Past Performance.  DOE's evaluation was not arbitrary and capricious because it failed to consider a 2023 settlement agreement between the incumbent and DOE, as the agreement does not carry the import that National Energy suggests.  Nor did the Agency abuse its discretion by not allowing National Energy to submit a clarification addressing negative PPQs.

Even though National Energy's protest succeeds in part by showing that the Agency erred in one instance—with respect to its evaluation of the CAS approach—the Court finds that absent such error National Energy would not have had a substantial chance of winning the M&O contract. SSP, the awardee, had a far superior proposal in almost all the other Management Approach elements.  Thus, DOE's error was not prejudicial, and National Energy's protest must fail.

**A.    DOE's Assessment of National Energy's CAS Approach was Arbitrary and Capricious Because DOE Compared National Energy's Approach to Post-Solicitation Contract Clause H.38, Not to the Stated Evaluation Criteria.**

National Energy's first challenge to DOE's evaluation of its proposed Management Approach centers around DOE's apparent application of unstated evaluation criteria.[5]  It is well settled that "[a]n agency must evaluate proposals and make awards based on the criteria stated in the solicitation." *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024) (citing *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 219 (2020)).  To succeed on a claim of unstated evaluation criteria, a protestor "must show that the procuring agency used a 'significantly different basis in evaluating the proposals than was disclosed' in the solicitation." *Poplar Point*, 147 Fed. Cl. at 219 (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536–37 (2010)).  Although an agency has "great discretion in determining the scope of an evaluation factor" and need not identify with specificity intrinsic elements to be considered under stated evaluation factors, "an agency's discretion to conduct its technical evaluation is not without its limits." *Samsara*, 169 Fed. Cl. at 319 (internal quotation marks and citations omitted).  DOE exceeded its discretion in this case.

Here, the PWS for the M&O contract included a requirement for the awardee to "establish a [CAS] program in accordance with DOE requirements and . . . include a process to ensure contract requirements are being met." AR 48.  The Agency provided specific requirements for the

---

[5] In its Motion for Judgment on the Administrative Record, National Energy initially argued that the Solicitation required offerors only to propose an approach to *implementing* a CAS, rather than an approach that contained details about the substance of a CAS.  *See* ECF No. 16 at 23.  National Energy seems to have walked that argument back in its Reply and at oral argument and now agrees that the Agency could properly evaluate the substance of an offeror's CAS approach.  *See* ECF No. 23 at 8; *see also* Oral Arg. Tr. at 9:14–20, ECF No. 42.  It clarified that its main quarrel with the Agency's evaluation was DOE's application of the requirements in clause H.38, which are beyond the Solicitation's evaluation criteria.  *See* ECF No. 23 at 8.

awardee's CAS, which would be developed and approved *after award*, in a special contract clause included in Section H of the Solicitation. AR 635–36 (Clause H.38 (DOE-H-7003 Contractor Assurance System (Sep 2017))). But for purposes of *the proposals*, Section L of the Solicitation simply instructed offerors to "demonstrate the depth, quality, effectiveness, and completeness of the Offeror's proposed approach to managing the contract, including implementing a contractor assurance system that identifies and corrects deficiencies . . . ." AR 690–91. Section M of the Solicitation described the Agency's evaluation of CAS proposals in the same way. AR 728 ("DOE will evaluate the depth, quality, effectiveness, and completeness of the Offeror's proposed approach to managing the contract, including implementing a contractor assurance system that identifies and corrects deficiencies . . . .").

In National Energy's view, it did just that—it proposed a CAS approach "to support overall performance of the SPR PWS and enable safe, efficient, compliant mission execution." AR 5084. The elements of its CAS included plans to [. . .] to strengthen CAS, [. . .], [. . .], . . . [e]stablish [. . .] and [. . .] to identify and drive timely improvements, performance, and quality and implement/track corrective actions, as needed," and "[e]nsure SPR, DOE-wide, and corporate lessons learned are shared/applied as applicable." *Id.*

The SEB gave National Energy a "Weakness" for its CAS proposal, reasoning that National Energy's "lack of a detailed approach to CAS is likely to increase the risk of poor contractor performance and can result in poor regulatory and safety compliance." AR 11899. It explained that National Energy's CAS approach (1) failed to "clearly define[]" its "processes, key activities, and accountabilities;" (2) failed to "address the identification and correction of negative performance/compliance trends before they become significant issues;" (3) omitted any "metrics and targets to assess performance;" and (4) generally lacked detail. *Id.* Essentially, the SEB found

National Energy's CAS approach lacking because it was not comprehensive enough. *Id.* The SSA agreed with that evaluation, *see* AR 12262, also noting that National Energy "did not address the identification and correction of negative performance/compliance trends before they become significant issues" and did not "discuss the integration of CAS with other management systems including Integrated Safety Management." AR 12274–75.

It may well be true that National Energy's CAS approach lacks enough detail to warrant assigning it a "Strength." Indeed, National Energy does not argue that it deserved a Strength. But it appears that the Agency's assignment of a Weakness resulted from comparing National Energy's CAS approach to something other than the proposal instructions contained in Section L and the evaluation criteria provided in Section M of the Solicitation. As explained by the SEB, National Energy received a Weakness because its CAS approach "does not adequately address the related elements listed in the RFP." AR 11899. Juxtaposing the Agency's description of the proposal flaws with clause H.38 in Section H, the Court agrees with National Energy that DOE treated that clause as an evaluation benchmark in its decision-making process. *Compare* AR 11899, 12274–75 *with* AR 635–36. As National Energy highlights, the language in clause H.38 almost exactly mirrors much of the language in the SEB's and SSA's descriptions—both reference a "comprehensive description" of the CAS; "processes, key activities, and accountabilities;" "identification and correction of negative performance/compliance trends before they become significant issues;" "integration of the assurance system with other management systems including Integrated Safety Management;" and "[m]etrics and targets to assess performance, including benchmarking . . . with other DOE contractors, industry and research institutions." *Id.* While not every element in clause H.38 appears in the SEB's and SSA's assessments of National Energy's CAS approach, the elements that do (sub-sections (a).1, 5, 6, and 7) are quoted almost verbatim.

20

AR 11899, 12274–75.  This same language does not appear in Sections L or M of the Solicitation. *See IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 298–99 (2022) (holding that special contract requirements "govern[] the terms of the contract only *after* the award (during contract administration) and do[] not apply to an offeror's proposal" (emphasis in original)).

For its part, the Government points out that the Agency's main critique of National Energy's CAS proposal was its lack of a detailed approach.  *See* ECF No. 21 at 29.  The Government asserts that DOE assessed a Weakness against National Energy not by applying the criteria in clause H.38 but rather by grading National Energy's CAS proposal against the criteria outlined in the Solicitation.  *Id.* at 28–30.  SSP highlights that each of the other five offerors—all but National Energy—understood the Solicitation to require a detailed approach to CAS, and each of them provided more detail than National Energy in their proposals.  *See* ECF No. 20 at 20–21. The Court, however, cannot ignore the obvious similarities between clause H.38 and the Agency's evaluation; they are strong evidence that the SEB and SSA were using clause H.38 as a grading rubric.

As such, the Court finds that DOE's evaluation of National Energy's CAS approach applied unstated evaluation criteria.  Deviating from the stated evaluation criteria of the Solicitation renders DOE's assignment of a Weakness arbitrary and capricious.

## B. DOE's Evaluation of National Energy's Proposed LE2 Approach Was Not Arbitrary and Capricious.

National Energy's second challenge to DOE's evaluation of its Management Approach, which pertained to its LE2 proposal, fails because DOE did not apply unstated evaluation criteria in assigning that element a Weakness.

The PWS set out several requirements for the awardee's work on the LE2 project. *See* AR 52–54. Like the evaluation criteria for CAS, Section M of the Solicitation informed offerors that DOE would "evaluate the depth, quality, effectiveness, and completeness of the Offeror's proposed approach to managing the contract," which included the offerors' LE2 approach. AR 728. The SSA concluded that National Energy's LE2 approach "lacks the detail to justify a strength." AR 12276. This conclusion, the SSA explained, was due to National Energy's failure to "provide the specifics necessary to substantiate an improved approach to LE2 with the use of the same GC" as FFPO is using under the incumbent contract. *Id.* National Energy describes this analysis as raising an issue with "contract administration on the incumbent contract" and criticizes the Agency for focusing on the incumbent's performance rather than on National Energy's own proposal. ECF No. 16 at 28. In National Energy's view, the Agency should not have considered the incumbent efforts to improve the general contractor's performance in assessing National Energy's proposal for future LE2 performance under the new award because that was beyond the scope of the evaluation factors in the Solicitation. *Id.*; *see also* ECF No. 23 at 11–12 (reiterating that the Solicitation did not require National Energy to justify or explain its use of the incumbent's general contractor).

National Energy's arguments are unavailing. As the Government aptly notes, DOE's assignment of a Weakness for National Energy's LE2 approach reflected the SSA's reasonable consideration of what National Energy itself proposed. In the first line of its LE2 proposal, National Energy touted the addition of "[. . .] plus strengthened and refreshed management and technical approaches *to address known issues and challenges*." AR 5090 (emphasis added). It summarized the progress that the incumbent (FFPO) had made on the LE2 project in recent years and emphasized the benefits of continuity between the incumbent and new contracts, including the

22

continued involvement of National Energy's parent company, Fluor Federal, and the general contractors currently performing LE2 work. AR 5091. National Energy specifically recognized that one general contractor "has struggled with the complex work scopes," explained how FFPO had attempted to mitigate the performance problems, and committed to "continu[ing] these initiatives at LE2, closely monitor[ing] the GC's progress, and implement[ing] additional corrective measures when needed" going forward. *Id.*

Given National Energy's stated plan to use the same general contractor as FFPO for the LE2 project, it was well within the Agency's purview to analyze FFPO's past issues with that general contractor in evaluating National Energy's proposed approach for using that contractor in the future. This was not a matter of contract administration, as National Energy argues, but rather a rational consideration given that National Energy was proposing to use a general contractor with known performance deficiencies. Whether National Energy sufficiently proposed solutions to improve the general contractor's performance going forward was a judgment the Agency reasonably needed to make to "evaluate the depth, quality, effectiveness, and completeness" of National Energy's LE2 approach. AR 728.[6] While an agency may not apply different criteria than what is stated in the solicitation when evaluating proposals, *see Frawner Corp. v. United States*, 161 Fed. Cl. 420, 443 (2022), it must look at what the offerors propose and analyze what is in front of it.

---

[6] In fact, it may have been arbitrary and capricious for the Agency *not* to consider FFPO's past issues with the general contractor given that National Energy's proposed LE2 initiative depended on that contractor's future performance. Consideration of the past issues was "intrinsic to the stated factors" in the Solicitation, *Samsara*, 169 Fed. Cl. at 319, given that the PWS requirements for LE2 charged the awardee with "[r]esponsibility, accountability, and authority to execute the work" and "[p]erforming construction supervision, procurement/subcontract administration, project controls, safety and quality oversight," AR 53.

Ultimately, the SSA reasoned that National Energy's "listing of FFPO mitigating actions lacks detail and does not provide the specifics necessary to substantiate an improved approach to LE2 with the use of the same GC." AR 12275–76. The Agency's decision to assign a Weakness to National Energy on this basis is well-explained and rational, reflecting the SSA's weighing of the risks to the Agency. *See* AR 12260 (reasoning that National Energy's plan of "[t]aking unspecified [. . .] on a large firm-fixed price contract is likely to require the removal of awarded scope and negatively impact LE2 cost and schedule"). The Court will not interfere with DOE's reasonable judgment calls, particularly in an area in which the Agency is assessing highly technical approaches to managing construction improvements to underground salt dome caverns.

**C.    DOE Did Not Unreasonably Evaluate National Energy's Past Performance.**

National Energy's final challenge takes issue with DOE's evaluation of its Past Performance. Summarizing various past performance information, the SSA described National Energy's Past Performance as "a mixed bag." AR 12287. However, the SSA disagreed with the SEB's assignment of a "Satisfactory" rating and concluded that National Energy should receive a rating of "Good" (and no higher) for its overall Past Performance. AR 12283. National Energy argues that (1) the SSA's evaluation was arbitrary and capricious because the SSA ignored a close-at-hand settlement agreement that purportedly mitigates two adverse fee determination letters identified in the SSA's analysis and (2) the SSA abused his discretion by not seeking clarification from National Energy to allow it to respond to negative PPQs. Neither objection succeeds.

1.    The Agency Did Not Unreasonably Fail to Consider the 2023 Settlement Agreement between DOE and FFPO.

National Energy argues that DOE unreasonably evaluated its Past Performance by not considering a 2023 settlement agreement between FFPO and DOE ("Settlement Agreement")

related to reductions in FFPO's award fees for 2020 and 2021. *See* ECF No. 16 at 33. In its opening brief, National Energy contended that the Settlement Agreement is "seemingly strong proof" that FFPO's position on the disputed fee reductions from those years had merit, otherwise DOE would not have paid the incumbent $[. . .] to settle the dispute. *See id.* at 32. In National Energy's view, had the SSA considered that DOE "capitulated" when FFPO sued the Agency to challenge the fee reductions, the SSA would have reached a different conclusion about National Energy's Past Performance. *Id.* at 33. National Energy walked back its argument to some extent in its Reply, explaining that it is not using the Settlement Agreement to prove liability but rather to show the existence of a dispute in the first place. *See* ECF No. 23 at 16.

National Energy urges the Court to supplement the record with the Settlement Agreement under the "too close at hand" doctrine because the Settlement Agreement is past performance information known to DOE that is necessary for the Agency to understand "the whole story" about the 2020/2021 fee reductions. Pl.'s Mot. to Suppl. Admin. R. at 3, ECF No. 17; *see* ECF No. 16 at 33 (citing *Int'l Res. Recovery, Inc. v. United States*, 64 Fed. Cl. 150, 158 (2005)). "Close at hand information" is typically past performance information that is "in the possession of the contracting agency or . . . that is personally known to the contract evaluator." *Insight Pub. Sector*, 157 Fed. Cl. at 410. Courts have held that, in certain circumstances, procuring agencies are obligated to consider close at hand information in evaluating an offeror's past performance. *See Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 781 (2011) (collecting cases). Since a close-at-hand claim is premised on an allegation that a procuring agency ignored past performance information during its evaluation, courts have recognized that such a claim may warrant supplementation of the administrative record in a bid protest. *See Vanguard Recovery Assistance*, 99 Fed. Cl. at 100 n.19. Supplementation is, however, an exception to the APA's

25

narrow scope of judicial review, and should be allowed "only if the existing record is insufficient to permit meaningful review consistent with the APA." *Axiom*, 564 F.3d at 1381 ("The focus of judicial review of agency action remains the administrative record.").

As an initial matter, the Court agrees with National Energy that the Settlement Agreement is at least related to the 2020 and 2021 fee reductions. The face of the documents show that the 2020 and 2021 fee determination letters include the same categories as those listed in the Settlement Agreement. *Compare* AR 11379–80 (discussing [. . .] and [. . .] issues), 11383–84 (discussing [. . .] and [. . .]) *with* ECF No. 15-1 at 5 (listing [. . .], [. . .], [. . .], and [. . .] as the fee reductions claims subject to the settlement).

However, the Court's concurrence with National Energy's argument ends there. That is because National Energy's logic flounders as to the purpose for which the Agency should have considered the Settlement Agreement in its Past Performance evaluation. For the agreement to undercut reliance on the fee determination letters, it would need to show that the Agency's reduction in fees for 2020 and 2021 was erroneous—in other words, that DOE "capitulat[ed]" to the incumbent's suit and admitted liability. Construing the Settlement Agreement in that manner is both precluded by Federal Rule of Evidence 408 and contravened by the text of the agreement itself.[7] *See* ECF No. 15-1 at 6 (". . . by entering into this Agreement neither of the Parties admits or acknowledges the existence of any liability or wrongdoing"). On the other hand, claiming that

---

[7] Although National Energy claims that it is not using the Settlement Agreement to show anything more than the existence of a dispute, its argument presupposes that it is using it to prove the merit of FFPO's claim. *See* ECF No. 16 at 33 ("Had the SSA considered that DOE essentially conceded these points to Fluor Federal and *paid most of the withheld fee for 2020 and 2021*, he likely would have reached a different conclusion about National Energy's past performance." (emphasis added)). FRE 408 prohibits the use of settlement agreements to "prove or disprove the validity or amount of a disputed claim." FRE 408(a).

the Settlement Agreement only shows that FFPO disputed the fee reductions does not in itself undermine the Agency's prior decisions to reduce the award fees or provide the Agency with any specifics about the incumbent's side of the story. In such case, it was reasonable for the Agency not to consider the Settlement Agreement. National Energy simply cannot have it both ways.

The import of the Settlement Agreement to the SSA's Past Performance analysis is also the fundamental flaw in National Energy's argument to supplement the record. National Energy's "too close at hand" argument depends upon categorizing the Settlement Agreement as past performance information. While *International Resource Recovery* did suggest that a settlement agreement can be past performance information, the facts of that case are distinguishable. There, the procuring agency considered a negative past performance questionnaire related to one of the offeror's past performance references—a contract for residential refuse collection that was terminated for default. *Int'l Res. Recovery*, 64 Fed. Cl. at 158. After the initial past performance evaluation was complete, the evaluators learned of a settlement agreement related to the contract that included an agreement "to convert the termination for default into a termination for convenience and upgrade Plaintiff's [performance assessment report] on the Residential Contract so that Plaintiff would not be rated unsatisfactory in any category." *Id.* at 157. The court held that the contracting officer wrongly determined that the settlement agreement should not be considered by the evaluators because it was not part of the offeror's proposal submissions, although the court went on to hold that the error was harmless. *Id.* at 163.

Contrary to National Energy's reading, *International Resource Recovery* cannot be read broadly to hold that "a settlement agreement *relevant* to an offeror's Past Performance evaluation can be 'past performance information' that is too close at hand to ignore." ECF No. 23 at 17 (emphasis added). Mere relevancy was not the standard applied; rather, the key fact in

*International Resource Recovery* was that the settlement agreement directed a substantive change to the offeror's performance assessment, thus rendering inaccurate the past performance questionnaire evaluated by the agency for that reference. 64 Fed. Cl. at 150. Here, on the other hand, as SSP correctly notes, the Settlement Agreement only concerns the amount of fees awarded to FFPO in 2020 and 2021; it does not agree to any changes to the incumbent's performance assessments or modifications to the Agency's fee determination letters in those years. *See* ECF No. 20 at 31–32; *see also* ECF No. 22 at 5.

Because the Settlement Agreement here cannot be characterized as past performance information, the Agency need not have considered it under the "too close at hand" doctrine. *See Insight Pub. Sector*, 157 Fed. Cl. at 410. The agreement is therefore not necessary to facilitate meaningful judicial review in the instant protest, and the Court accordingly finds no merit in National Energy's motion to supplement the administrative record.

Finally, even if the Court agreed with National Energy that the SSA should have considered the Settlement Agreement, and thus supplementation is warranted, it is far from clear that the SSA's overall evaluation of National Energy's Past Performance would have changed. This is largely because, as SSP underscores, the Settlement Agreement only addressed fee reductions in 2020 and 2021, while the main justification for the SSA rating National Energy's Past Performance as no higher than "Good" derived from National Energy's poor CPARS ratings and negative PPQs for its performance in 2023 and 2024. *See* ECF No. 20 at 32; *see also* AR 12284–85 (detailing CPARS ratings of "Satisfactory" in Quality, Schedule, Cost Control, Management, Small Business Contracting, and Regulatory Compliance in 2023 and 2024), 12285 (underscoring concern about the April 3, 2024, PPQ from the Program Manager, which indicated "Marginal" ratings in several areas and an overall negative trend in contract performance). The Settlement Agreement does not

28

relate to and would not affect the driving factor behind the SSA's overall Past Performance decision, which was the incumbent's more recent declining performance. With or without consideration of the 2020/2021 fee reductions, National Energy's overall Past Performance would still be "a mixed bag." AR 12287. Thus, the Agency's alleged error in not considering the agreement was not prejudicial to National Energy.

        2.      <u>The Agency Did Not Abuse Its Discretion by Not Allowing Clarifications Regarding National Energy's Negative PPQs.</u>

National Energy's next challenge to its Past Performance evaluation is that the Agency failed to allow it to clarify (*i.e.*, respond to) its negative PPQs. *See* ECF No. 16 at 33–36. FAR 15.306(a) governs clarifications, which are defined as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." Clarifications may concern, for example, "the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond[] or . . . minor or clerical errors." FAR 15.306(a). Under the FAR, a procuring agency is not obligated to seek clarification; it is a matter of the agency's discretion. *Id.* ("[O]fferors *may* be given the opportunity to clarify certain aspects of proposals . . . ." (emphasis added)).

Here, the Solicitation contemplated award without discussions, and it left open the opportunity for clarifications regarding past performance information. *See* AR 726, 752–53. National Energy is correct that the negative PPQs at issue fall into the category of "adverse past performance information to which [it had] not previously had an opportunity to respond," FAR 15.506(a), because the PPQs were completed by the contract references and sent directly to the Agency separate from National Energy's submitted proposal. *See, e.g.*, AR 11583. However, as

National Energy concedes, clarifications are discretionary.  *See* ECF No. 16 at 34.  Given the discretionary nature of clarifications, combined with the "heavy burden" a protestor must carry in a bid protest to overcome the presumption of regularity, *Impresa*, 238 F.3d at 1338, National Energy's argument can succeed only if it shows that DOE abused its discretion.  National Energy fails to clear that high bar.

National Energy's main case on the subject, *BCPeabody Construction Services, Inc. v. United States*, 112 Fed. Cl. 502 (2013), is inapposite.  There, the court found an abuse of discretion where the agency "had virtually overwhelming cause" to allow the protestor to clarify an obvious clerical error (a copying mistake) in its proposal but failed to do so.  *Id.* at 512.  Here, in contrast, there was no clerical error; National Energy is simply disappointed to have not had the chance to challenge its poor PPQs.  But mere disagreement with DOE's course of action is insufficient to show that it abused its discretion.   *See In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (describing the arbitrary, capricious, or abuse of discretion test as "[t]he narrowest scope of judicial review").  National Energy must do more than point to the fact that DOE's evaluation was based on unrebutted, adverse PPQs because both the FAR and the Solicitation contemplated that very circumstance.  *See Serco Inc. v. United States*, 81 Fed. Cl. 463, 486 n.35 (2008) ("[N]either the FAR nor the Solicitation guaranteed that an offeror would have an opportunity to respond to such [adverse past performance] information—both talk only in permissive terms.").

National Energy cites no case in which an agency was found to have abused its discretion by not permitting clarifications to allow a protestor to address adverse past performance information.  Though not cited in its briefing, at oral argument, National Energy urged the Court to consider the Government Accountability Office's ("GAO") decision in *General Dynamics-*

*Ordnance & Tactical Systems*, B-295987 et al., 2005 CPD ¶ 114 (Comp. Gen. May 20, 2005).  In

that decision, the GAO stated that

> . . . for the exercise of discretion to be reasonable, the agency must give the offeror an opportunity to respond where there clearly is a reason to question the validity of the past performance information, for example, where there are obvious inconsistencies between a reference's narrative comments and the actual ratings the reference gives the offeror.

*Gen. Dynamics*, B-295987, at 9.[8]  Comparing the CPARS ratings (AR 11435) to the PPQs (AR

11580–86) evaluated by the Agency, National Energy argues that these documents show the kind

of "obvious inconsistencies" that warrant clarifications.  *See* Oral Arg. Tr. at 40:1–5, 42:6–23,

ECF No. 42.  Even applying the logic of *General Dynamics*, National Energy seems to be making

the wrong comparison.  *General Dynamics* does not suggest the Court compare different past

performance documents to one another, but rather that the Court look at whether there are glaring

inconsistencies within a past performance document, *e.g.*, where the narrative comments do not

align with the numerical ratings.  *Gen. Dynamics*, B-295987, at 9.  Here, the PPQs have consistent

narrative comments and numerical ratings; the comments are more negative for the areas in which

National Energy received poor ratings, and more positive for the areas with better ratings.  *See,*

*e.g.*, AR 11585–86.  If there were obvious mismatches—for instance, a rating of "0" and a highly

positive narrative comment in the same category within the same PPQ—the Court would agree

with National Energy.  But that is simply not the case here.  Thus, *General Dynamics* does not

save National Energy's clarification argument.[9]  As the Solicitation explained, clarifications were

---

[8] Page numbers refer to the publicly available decision on the GAO's website, available at https://www.gao.gov/assets/b-295987%2Cb-295987.2.pdf.

[9] Further, in *General Dynamics* itself, the GAO declined to hold that the Government abused its discretion in not permitting clarifications in a situation, like here, where there was no reason to doubt the accuracy of the Agency's evaluation.  *See Gen. Dynamics*, B-295987, at 9

a possibility, not a guarantee. The decision not to seek clarification was not an abuse of the Agency's discretion.

### D. Even Though the Agency Erred in Its Evaluation of National Energy's CAS Approach, National Energy Fails to Show Prejudice.

While some errors in the procurement process can amount to prejudicial mistakes that justify setting aside a procurement award, "[d]e minimis errors in the procurement process do not justify relief." *Chenega Healthcare Servs., LLC v. United States*, 138 Fed. Cl. 644, 649 (2018) (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996)). Rather, a protestor has to show that an agency's errors denied it a substantial chance of winning the contract. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996).

Citing *Gemini Tech Services, LLC v. United State*s, 176 Fed. Cl. 461, 469 (2025), National Energy argues that all it must show to meet the prejudice standard is that "its chances for award would have increased" if the Agency's alleged errors were corrected. *See* ECF No. 16 at 38. But National Energy misstates the standard. As *Gemini* itself explained, a contractor must show that it had "a substantial chance at contract award" but for the alleged error. 176 Fed. Cl. at 469. In *Gemini*, the court found prejudicial error where the Army failed to properly establish a competitive range in violation of FAR 15.306(c)(1). *Id.* at 468. That error was prejudicial, the court said,

---

(explaining that "the agency reasonably exercised its discretion in deciding not to communicate with GD-OTS [the protestor] regarding the delays under the LRIP contract, since the information was based on first-hand knowledge of Navy personnel who evaluated the protester's past performance; thus, there was no reason for the Navy to have questioned the validity of its own conclusions"). Thus, while *General Dynamics* laid out a general standard for identifying instances in which clarifications might be warranted to resolve adverse past performance information issues, the facts of that case did not meet that standard and are in fact strikingly similar to those present here. National Energy complains about its negative PPQs, but those questionnaires were filled out by the Contracting Officer and the Program Manager, each of whom had "first-hand knowledge" of the incumbent's performance; thus, "there was no reason for [DOE] to have questioned the validity of its own conclusions." *Id.*

because the protestor would have been included in the competitive range had one been properly established, thus potentially putting the protestor in line for award. *Id.* Here, National Energy's proposal was one of the three proposals considered in the SSA's tradeoff decision. Thus, unlike in *Gemini*, DOE considered and evaluated National Energy for a potential award. Thus, to demonstrate a substantial chance of winning the award, National Energy must show not simply that its adjectival ratings would have improved had the Agency properly evaluated its CAS approach, but that those improved ratings would have potentially changed the tradeoff analysis in such a way that National Energy would have had a substantial chance of coming out on top. National Energy's characterization of the prejudice bar is too low.[10]

The Court approaches the prejudice question in two steps, applying the "substantial chance" standard at each step. *Statistica*, 102 F.3d at 1582. First, it considers whether the Agency's error in evaluating National Energy's CAS approach was prejudicial to the tradeoff between SSP and National Energy as to the CAS element on its own. Second, the Court considers prejudice in the aggregate: in other words, even if prejudice exists as to the CAS element, does that prejudice result in overall prejudice when comparing the two proposals in their entirety? Both with respect to the CAS element and in the aggregate, National Energy has not met its burden.

---

[10] At oral argument, National Energy urged the Court to identify prejudicial error based on the reasoning set forth in *Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 338 (2020), which found prejudice where an agency's error was significant to the protestor's chance of being awarded the contract. *See* ECF No. 42 at 89:2–6. That case relied on *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 327–29 (2006), and *Caddell Construction Co. v. United States*, 125 Fed. Cl. 30, 50 (2016), two cases which the Federal Circuit has since explicitly rejected to the extent they support a presumption of prejudice. *See Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) ("We hold that there is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision. The protestor must show prejudice under the usual standard.").

At step one, the Court finds that the Agency's error in evaluating National Energy's CAS approach was not significant enough to be prejudicial. At most, National Energy would have received neither a Strength nor a Weakness for its CAS approach had the Agency not graded the approach against clause H.38. Even if National Energy were to receive a Strength upon re-evaluation (a rating for which it does not argue), SSP's lead would be undisturbed in that category because SSP would still have a Significant Strength for its CAS approach.[11] *See* AR 12271. And even if, hypothetically, National Energy could leap up to a rating of Significant Strength for its CAS approach, that would put National Energy and SSP neck-and-neck in that element; it would not give National Energy an advantage over SSP. *See id.* Since there is no rating above Significant Strength, it is implausible that National Energy could have a positive discriminator over SSP for this element. In sum, National Energy has not shown that the evaluation error with respect to its CAS approach was prejudicial.

At the second step, even assuming some prejudicial error at the element-level, the Agency's improper evaluation of National Energy's CAS approach did not prejudice National Energy in the aggregate when comparing SSP's and National Energy's proposals in their entirety. Applying the "substantial chance" standard, it is clear that removing National Energy's Weakness for its CAS approach would not change the overall trade-off calculus because SSP had five other discriminators in its favor for the Management Approach. *See* AR 12271. The loss of one discriminator for the CAS element would not disturb SSP's overall lead, especially where Management Approach was just one of the three technical factors considered within Volume II of

---

[11] At oral argument, National Energy admitted that SSP had a better and more specific approach to CAS as compared to National Energy. *See* ECF No. 42 at 14:9–14. Since National Energy alleges an evaluation error and not an error that would necessitate revised CAS proposals, the advantage that SSP has over National Energy for the CAS element would remain.

offerors' proposals.  AR 732.  The SSA found that "SSP offered a far better management approach . . . [which] amply warrants the relatively small price premium."  AR 12287–88.  Given the SSA's description of SSP's Management Approach as "far better" and "amply warrant[ing]" the price difference, any correction of the Agency's singular error would not have a substantial chance of tipping the scales in National Energy's favor.

The Court rejects National Energy's urging that any positive change in a protestor's evaluation should result in a remand to the agency because the prejudice question is too hypothetical for the Court to consider in the first instance.  *See* ECF No. 23 at 20–21.  To hold as much would effectively erase the prejudice standard in its entirety by undermining the logic of prejudicial error.  *See Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1290 (Fed. Cir. 2020) (explaining that the "*Chenery* doctrine [] does not invariably require a remand to the agency whenever a court holds that the agency's action was based on legally improper grounds").  The magnitude of error here is not large—in fact, it is quite insubstantial, given that a re-evaluation would most likely result in only a small turning of the dial in National Energy's favor, if any.  And where, as here, "the result is foreordained," the Court need not remand.  *See id.* (citing *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984)).

### E.    Injunctive Relief is Not Appropriate.

National Energy requests that the Court permanently enjoin the award to SSP.  *See* ECF No. 41 at 46.  To obtain permanent injunctive relief, National Energy must show that (1) it succeeded on the merits of the case, (2) it will suffer irreparable harm if the Court withholds injunctive relief, (3) the balance of hardships favors an injunction, and (4) it is in the public interest to grant injunctive relief.  *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  National Energy has failed on the merits; thus, the Court need not assess the remaining

factors.  *Obsidian Sols. Grp., LLC v. United States*, 54 F.4th 1371, 1376 (Fed. Cir. 2022) ("There

can be no injunctive relief without a corresponding prevailing claim."); *Dell Fed. Sys., L.P. v.

United States*, 906 F.3d 982, 999 (Fed. Cir. 2018) (holding that "proving success on the merits is

a necessary element for a permanent injunction"); *DevTech Sys., Inc. v. United States*, 176 Fed.

Cl. 297, 339 (2025).  Because National Energy's protest fails, it is not entitled to injunctive relief.

## CONCLUSION

For the foregoing reasons, National Energy's Motion for Judgment on the Administrative

Record (ECF No. 16) and Motion to Supplement the Administrative Record (ECF No. 17) are

**DENIED**.  The Government's Cross-Motion for Judgment on the Administrative Record (ECF

No. 21) and Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record

(ECF No. 20) are **GRANTED**.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

Dated: September 30, 2025                    */s/ Kathryn C. Davis*
                                             KATHRYN C. DAVIS
                                             Judge